FILED
APR 2 2 2008
NANCY MAYER WHITTINGTON, CLERK
U.S. DISTRICT COURT

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| UNITED STATES OF AMERICA | : |
| v. | : CRIMINAL NO. 08-111 (ESH) |
| ROBERT E. COUGHLIN II | : |

...oooOooo...

## STATEMENT OF THE OFFENSE

If this case had proceeded to trial, the Government would have proved the following facts beyond a reasonable doubt:

**I.   Background.**

1.   After having worked there in 1995 to 1996, in or about 1999, Robert E. Coughlin II returned to being a staff member on Capitol Hill. At that time, he renewed his acquaintance with Lobbyist A (who was then working in government service). Coughlin had met Lobbyist A in about 1992, and considered him to be a friend. While they worked on Capitol Hill, they socialized together over meals and drinks, sports and golf. Lobbyist A left his work on Capitol Hill in or about December 1999.

2.   In or about March 2001, at the age of 29, Coughlin was hired to be a Special Assistant to the Assistant Attorney General for Legislative Affairs at the Department of Justice ("DOJ") in Washington, D.C. His duties included advising DOJ, tracking certain DOJ matters that had received attention from Capitol Hill and serving as a liaison for Capitol Hill staff members and others, including lobbyists, who had legislative issues impacting DOJ.

3.   In or about May 2002, Coughlin was promoted to Deputy Director of the Office of Intergovernmental and Public Liaison at DOJ. His duties included counseling DOJ on issues

1

relating to other government agencies, outside organizations, and state and local elected officials. He also acted as the liaison between DOJ and outside groups, including their lobbyists.

4. In or about January 2001 and thereafter, Lobbyist A worked under Lobbyist B, who ran the government-relations practice at The Law/Lobbying Firm. The lobbyists had various clients with business before DOJ, including tribal clients seeking grants, corporations seeking contracts, and other clients interested in matters concerning DOJ. Lobbyist A used his contacts to lobby the DOJ on behalf of these clients.

5. Coughlin never had a substantive conversation with Lobbyist B.

## II. One tool of Lobbyist A's practice was the provision of things of value to public officials.

6. Consistent with Lobbyist B's lobbying practices, Lobbyist A provided items of value to government officials, including DOJ officials whom he was lobbying or who might be in a position to assist him in the future. These items of value included meals and drinks at upscale restaurants in Washington, D.C., including Signatures, a restaurant owned by Lobbyist B. These items of value also included rounds of golf and stadium and luxury-suite tickets to concerts and sporting events at the MCI Center, Camden Yards, and FedEx Field.

7. It was Lobbyist A's practice at The Law/Lobbying Firm to pick up the tab for and expense to clients the entire cost of meals and drinks he had with business contacts whenever they were out together. Coughlin understood that in general Lobbyist A did not pay for these meals, tickets or golf outings with his personal funds. Coughlin believed that in general The Law/Lobbying Firm, rather than a particular client, was paying for these costs. Coughlin did not know that Lobbyist A billed the hours he spent socializing with Coughlin as lobbying activities.

Coughlin also was unaware that Lobbyist A held Coughlin out to be one of his most valuable lobbying contacts at DOJ.

**III.   Coughlin willfully participated personally and substantially as a government officer in particular matters in which Lobbyist A, The Law/Lobbying Firm and he himself had a financial interest.**

    **A.   Coughlin participated personally and substantially as a government officer in particular matters to assist Lobbyist A.**

    8.   Beginning when he joined DOJ in March 2001 until he transferred to the Eastern District of Virginia ("EDVA") on a detail in or about November 2003, Coughlin provided information, made recommendations, rendered advice, set up and attended meetings at DOJ and with lobbying clients, expedited DOJ action, strategized about how to reverse a previous DOJ decision about an application for a $16.3 million grant, and otherwise participated personally and substantially as a government officer, in particular matters in which Lobbyist A was lobbying DOJ. Coughlin took the following actions as a DOJ official, among others:

    a.   Coughlin provided Lobbyist A with information regarding DOJ internal deliberations regarding a bill impacting a client of Lobbyist A and The Law/Lobbying Firm;

    b.   Coughlin provided information regarding the status and responsibilities of certain DOJ officials, and advised Lobbyist A regarding which official in various components was a "friendly;" that is, a political appointee who would be favorably inclined toward assisting Lobbyist A and The Law/Lobbying Firm;

    c.   Coughlin contacted DOJ officials to research the meaning of language in the Patriot Act that might impact a client of Lobbyist A and The Law/Lobbying Firm;

    d.   Coughlin advised Lobbyist A and The Law/Lobbying Firm about changes in the

process for a client to submit antitrust filings after the anthrax scare;

  e. Coughlin contacted various DOJ officials to obtain information for Lobbyist A regarding a land dispute between two Indian tribes;

  f. Coughlin contacted a DOJ official to obtain information for Lobbyist A about a consent decree between a client of The Law/Lobbying Firm and a competing company;

  g. Coughlin contacted a DOJ official to obtain information about the purchase of one company by another, which purchase would impact a client of The Law/Lobbying Firm;

  h. Coughlin agreed to attend and attended meetings between Lobbyist A, his client(s) and other DOJ officials;

  i. Coughlin attended a dinner meeting in his official DOJ capacity with a client of The Law/Lobbying Firm, Lobbyist A and another lobbyist, which dinner was arranged by the lobbyists, according to Lobbyist A, merely "to fill [the client's] schedule with meetings;"

  j. Coughlin assigned a subordinate to "help" Lobbyist A regarding a certain tribal client matter; and

  k. On or about February 7, 2003, Lobbyist A wrote to Coughlin "Eshkol Academy [a school owned by Lobbyist B] needs an expedited review and approval of the I-17 (application) to admit F non-immigrant students[] including expedited site visit. In the alternative, they can request to issue interim approval while application is pending. . . . . A site visit must be conducted ASAP." Coughlin forwarded this e-mail to two DOJ employees, including an employee of the Immigration and Naturalization Service ("INS," which was at the time within DOJ), and stated "Thank you for looking into this. I do not know if anything can be done but I said I would look into it. If, for any reason, nothing can be done, please email me so I can pass

that along. Thank you very much for you[r] assistance." The INS agreed to expedite the review.

9. Another particular matter in which Coughlin participated personally and substantially as a government officer involved Lobbyist A's and The Law/Lobbying Firm's campaign to obtain a $16.3 million grant for a tribal client to build a jail. As of March 2001, the DOJ had approved only $9 million in grant funds.

10. Lobbyist A e-mailed Coughlin, in his role as a Special Assistant at DOJ's Office of Legislative Affairs ("OLA"), to ask for assistance on the tribal-jail-grant effort on April 16, 2001.

11. In an April 17 & 18, 2001, e-mail chain, Coughlin accepted a dinner invitation from Lobbyist A and informed Lobbyist A that the DOJ official at OLA who would handle the tribal-jail-grant issue had Democratic political leanings and accordingly might not be favorably inclined toward Lobbyist A.

12. In an April 19, 2001, e-mail chain, Lobbyist A invited Coughlin to dinner again and asked if Coughlin would attend the tribal-jail-grant meeting with the other DOJ officials, "[e]ven if it is just at the beginning to say hello, [because] it would be good if you were there so some of the clowns there know that I have friends, if you get my drift." Coughlin agreed to attend the meeting and accepted the dinner invitation. Referring to the DOJ official at OLA who handled the tribal-jail-grant issue and would attend the meeting, Coughlin offered, "this is her issue but let me know if you would rather not have her attend and I will take care of it." The official did attend the initial meeting with Lobbyist A and others on April 19, 2001, but thereafter had no further involvement in the tribal-jail grant. Thereafter, Lobbyist A sent OLA-related communications regarding the tribal-jail-grant issue to Coughlin.

13. The night of April 19, 2001, after the DOJ meeting with Lobbyist A regarding the tribal-jail-grant issue, Lobbyist A paid for dinner for Coughlin and Lobbyist A's wife at Olive's, for which Lobbyist A expensed $300.51.

14. In an April 24, 2001, e-mail chain, Coughlin thanked Lobbyist A for the dinner. Lobbyist A asked for more information about the jail grant. Coughlin told Lobbyist A that the tribe was presently approved to receive only $9 million. DOJ had rejected their application for the larger $16.3 million amount. Later in the same e-mail chain, Coughlin wrote:

> Let's talk some more about that [tribal-jail-grant] money. I know we touch[ed] on it on Thursday night [at the dinner at Olive's,] but maybe we could come [up] with some strategy in order to make sure they get the rest of the money. . . .

15. On April 25, 2001, Coughlin e-mailed Lobbyist A with the name of "our friendly in OJP." OJP is the acronym for Office of Justice Programs, the DOJ component that handled grant applications. Coughlin indicated that he would call the "friendly" and set up a meeting. In the same e-mail chain, Lobbyist A again invited Coughlin to dinner.

16. In May and July, 2001, Coughlin occasionally updated Lobbyist A regarding the status of the $16.3 million grant application. Coughlin also set up a meeting between Lobbyist A and an OJP political appointee with authority over the grant application decision.

17. On November 12, 2001, Lobbyist A e-mailed Coughlin and another DOJ official that The Law/Lobbying Firm had "reached a crisis point" in its effort to obtain the $16.3 million grant. Lobbyist A explained that "My senior partner, [Lobbyist B], has made abundantly clear to me that this is the highest priority. . . . . PLEASE let me know how to make this happen. THANKS to you both in advance." In response, Coughlin provided information to assist the lobbying effort and indicated that he would meet with certain DOJ officials regarding the issue.

The following day, Coughlin related to Lobbyist A a positive conversation he had with a high-ranking DOJ official about the grant application.

18. On multiple occasions from November, 2001, through January, 2002, Lobbyist A sent Coughlin legislative materials to distribute to the leadership of OLA, in a further attempt to cause DOJ to award $16.3 million to the tribe, and Coughlin discussed with Lobbyist A the lobbying effort, the responses of the OJP official who had decided that only $9 million was the appropriate grant amount, and the prospect that a more senior DOJ official would reverse that decision and decide instead that DOJ should award $16.3 million.

19. On or about January 31, 2002, DOJ reversed its prior decision and decided to award $16.3 million to Lobbyist A's tribal client for construction of the jail.

20. Lobbyist A continued to lobby DOJ over the following months, seeking a waiver of the requirement that the contract for the jail construction be competitively bid and seeking to expedite the release of the funds. Coughlin continued to participate in the particular matter.

21. On or about May 1, 2002, Coughlin transferred from OLA to the Office of Intergovernmental and Public Liaison ("OIPL"). Throughout May and June, 2002, acting as an OIPL official, Coughlin continued to contact DOJ officials in order to answer numerous inquiries from Lobbyist A about the tribal jail grant, and to advise Lobbyist A about whom he should contact.

22. On June 25, 2002, the lobbyists learned that their request to waive the competitive bidding requirement had been approved.

**B.     Coughlin had a financial interest in the particular matters in which he assisted Lobbyist A.**

23.     Coughlin had a financial interest in the particular matters about which Lobbyist A and The Law/Lobbying Firm contacted him because Lobbyist A was providing him with a stream of things of value for and because of Coughlin's official actions in connection with the successful lobbying efforts. Coughlin failed to report these things of value as gifts on his financial disclosure forms for the 2001, 2002, and 2003 years.

24.     The things of value that Lobbyist A provided to Coughlin included meals and drinks on about 25 occasions at Washington, D.C., restaurants and bars (primarily at upscale restaurants including Signatures); about 20 tickets to seven sporting events; about five tickets to about three concerts (and Coughlin solicited, but did not obtain, tickets to two other concerts); and one round of golf.

25.     For purposes of the cross reference to U.S. Sentencing Guidelines section 2C1.2, found within U.S.S.G. section 2C1.3(c), the government estimates that the value of the things of value that Coughlin received for or because of his official acts performed or to be performed was approximately $6,180. Coughlin estimates that the value was approximately $4,800.

26.     When Coughlin left his position at OIPL in or about November 2003 to go on a detail to EDVA, and was no longer able to assist Lobbyist A's efforts, Lobbyist A abruptly curtailed buying him meals, drinks and tickets – only to reconnect as soon as the detail ended and Coughlin returned to Main Justice.

27.     Coughlin personally received these things of value from Lobbyist A otherwise than as provided by law for the proper discharge of official duty, for or because of official acts

8

performed or to be performed by Coughlin in his capacity as a DOJ liaison. For example:

    a.    On April 5, 2002, Lobbyist A e-mailed Coughlin to ask, "Can you grab dinner with me, [another lobbyist], and a client ["next Thursday, April 11"]? We are asking for nothing. We just need to fill this guy's schedule with meetings." Coughlin replied, "Sure. Let me know the time and place." An itinerary for the dinner reads, "6:30 p.m. – Dinner with Bob Coughlin, Professional Staff, Department of Justice Inter-government Affairs Office. Location: Signatures Restaurant, 801 Pennsylvania Ave., NW." Coughlin attended the dinner-meeting, talked with the client and gave the client Coughlin's DOJ business card. The lobbyists paid for Coughlin's dinner for and because of his official action of attending the dinner-meeting in his capacity as a DOJ official.

    b.    On June 25, 2002, after learning that DOJ had approved the waiver of competitive bidding for the $16.3 million grant, Lobbyist A e-mailed Coughlin with the subject line "[Tribe]: CHA-CHING!!!!" Lobbyist A wrote to Coughlin, "Thanks is not strong enough. We need to celebrate this issue finally being over." Three days later, on June 28, 2002, Lobbyist A paid for lunch for Coughlin and two other DOJ officials at Signatures.

    c.    On or about February 10, 2003, after Coughlin passed along Lobbyist A's request to INS and INS agreed to expedite the review of the school owned by Lobbyist B, Lobbyist A wrote to Coughlin, "I cannot thank you enough for helping on this. [Lobbyist B] was very appreciative. You really helped me out. Drinks Thursday night?" Coughlin accepted the invitation to drinks, then asked, "Hey man. I have a favor to ask. Any way I can hit you up for Wizards tickets (4) on the 15th and 18th of March?" In appreciation for the assistance that Coughlin had provided, Lobbyist A gave him eight third-row floor tickets for the Wizards.

C. **Coughlin had discussions concerning prospective employment with Lobbyist A and The Law/Lobbying Firm while participating in particular lobbying matters to assist Lobbyist A.**

28. Coughlin continued his personal and substantial participation in the above-described matters, including the effort to convince DOJ to waive the requirement that the tribal-jail-construction project be competitively bid, at the same time that he was engaged in discussions with Lobbyist A with a view toward reaching an agreement regarding possible employment at The Law/Lobbying Firm. On two occasions in or about March and April, 2002, Coughlin and Lobbyist A discussed the prospect of Coughlin coming to work as a lobbyist at The Law/Lobbying Firm. One such discussion took place over lunch at Signatures at the lobbyist's expense. During the time in which Coughlin considered the prospect of working as a lobbyist at The Law/Lobbying Firm, he continued to handle matters at DOJ brought to his attention by Lobbyist A. This included continuing to serve as Lobbyist A's DOJ contact-person regarding the effort to persuade DOJ to waive the competitive-bidding requirement and to release the $16.3 million to the lobbyist's tribal client.

29. No formal offer was extended to Coughlin by The Law/Lobbying Firm. Coughlin was promoted within DOJ to become Deputy Director of the OIPL, beginning on or about May 1, 2002.

Respectfully submitted,

Stuart M. Goldberg
Acting United States Attorney

By: /s/ M. J. Leotta
Michael J. Leotta
Assistant United States Attorney

Special Attorneys to the Attorney General
36 South Charles Street
Fourth Floor
Baltimore, Maryland 21201
(410) 209-4800

I hereby stipulate that the foregoing statement of facts is true and correct and that I have reviewed the statement completely with my attorney.

/s/ Robert E. Coughlin II
Robert E. Coughlin II

/s/ Joshua G. Berman
Joshua G. Berman, Esquire,
*Attorney for Mr. Coughlin*

11